Including Cases of April and October Terms, 1920.

MORRIS GALLER AND EVA GALLER, HIS WIFE,

*vs.*

BENJAMIN GALLER.

*Money Had and Received—Evidence.*

One claiming that he left with another for safekeeping a certain sum of money has the burden of showing that he did leave such sum, before any burden can rest on such other to account therefor.                                                p. 14

On an issue as to the amount which a son, when about to enter the army, left with his father for safekeeping, *held* that the evidence produced by the son failed to show that he had so left the amount which he claimed to have left.          pp. 14-16

*Decided June 18th, 1920.*

Appeal from the Circuit Court of Baltimore City (AMBLER, J.).

The cause was submitted on briefs to BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Joseph Fax,* for the appellants.

*J. Louis Shochet* and *Daniel Ellison,* for the appellee.

PATTISON, J., delivered the opinion of the court.

The appellee in this case, Benjamin Galler, an unmarried man, while engaged in the wholesale and retail clothing business with one Abraham Blaustein, at 311 S. Broadway, Baltimore, Md., was in July, 1918, drafted into the military service of the United States.

Preparatory to entering the service, he sold his interest in the business to his partner, Blaustein, at and for the sum of five thousand, three hundred dollars ($5,300). Of this sum four thousand dollars ($4,000) were paid in a check and the balance in merchandise. The merchandise was by him turned over to his father, to be kept for him until his return, if he returned, and if he did not, it was to become the property of his father. The check for four thousand dollars ($4,000), dated the 30th day of July, 1918, was cashed by the appellee either on that or the following day.

Thereafter the appellee told his father that he was going to leave with him the proceeds of the check upon the terms and conditions that he left with him the merchandise, and on the 1st day of August, 1918, he, with his father and mother, went to the Savings Bank of Baltimore and there made a deposit "in the name of Morris Galler, in trust for himself and Eva Galler, joint owners, subject to the order of either, the balance at the death of either to belong to the other."

After the appellee was discharged from the service on the 12th day of December, 1918, he returned to the home of his parents, after first having spent a week or ten days in a hospital in the City of Baltimore. After remaining with them a few days he, with his father and mother, went to the bank and drew therefrom the amount there deposited in the name of Morris Galler, in trust for himself and Eva Galler, etc., the amount at that time being three thousand, eight hundred dollars ($3,800), with $42.50 accrued interest. It was all withdrawn and two accounts opened, one in the name of the son for three thousand dollars ($3,000), and the other in the name of the father for five hundred dollars ($500), and

three hundred dollars was paid to the appellee in cash. The interest, $42.50, was also paid to the son in cash, and of this amount he gave or loaned to his father five dollars ($5.00). This deposit was made on Saturday. He returned from the bank on that occasion with his parents to their home, where he remained until the following Monday, when he left, and it seems that from that time he ceased to make his home with them.

On January 6th, 1919, the first bill in these proceedings was filed. Later it was amended by one filed on the 28th day of March following.

In the amended bill it is alleged that the amount left with the father by the appellee was four thousand, two hundred dollars ($4,200) upon the terms and conditions stated, with the qualification that all of said sum except four hundred dollars ($400)

"were to be held intact in the Savings Bank of Baltimore; that it was agreed and understood that the defendant, Morris Galler, might either deposit the said sum of four hundred dollars ($400), or might retain said sum for a period of two months until he collected a certain promissory note, payable by Abraham Blaustein to the said Morris Galler, for the sum of four hundred dollars ($400), and then he was to deposit the said sum of four hundred dollars ($400) so received from the said Abraham Blaustein in the aforesaid bank."

It was further alleged in the bill that it was

"agreed and understood that the said defendant, Morris Galler, was to apply the said sum of four hundred dollars ($400) as part of the purchase price of the property situate in Baltimore City, known as 2010 E. Pratt Street, which the said defendant, Morris Galler, had contracted to purchase previous to the said 31st day of July, 1918, and that the said sum of four hundred dollars ($400) was used, on the 8th day of August, 1918, by the said Morris Galler for the purchase

of the aforesaid property, and that the title to said
property was taken in the name of Morris Galler and
Eva Galler, his wife."

The bill likewise alleged that the appellee called upon his
father upon his return from Camp Meade for the funds left
with him, and that, in turn, his father demanded certain'
sums of money from him; but, after quarrels between them in
relation thereto, his father, on the 4th day of January, 1919,
returned to him three thousand, three hundred dollars ($3,-
300) of said principal sum and $42.50 accumulated interest,
and that his father did then and does now refuse to return
the balance of nine hundred dollars ($900) still due him,
the son.

The prayer of the bill not only asks that the court decree
that the five hundred dollars ($500) in bank in the name of
Morris Galler be declared the property of Benjamin Galler,
and that the bank be restrained from paying the same to the
father, but it also asks that the "defendants, Morris Galler
and Eva Galler, his wife, may be decreed to hold the said
property 2010 E. Pratt Street as trustees for your orator to
the extent of the said sum of four hundred dollars ($400),"
and "that they be restrained from selling, mortgaging or
otherwise disposing or alienating" it "until the final deter-
mination of this suit."

The bank, as well as Morris Galler and Eva Galler, his
wife, answered the amended bill. In the joint answer of the
father and mother they deny that the plaintiff gave to or left
with him the sum of four thousand, two hundred dollars
($4,200), and allege that the amount so left with him was
only three thousand and three hundred dollars ($3,300),
which sum he deposited in the Savings Bank of Baltimore
and, upon the appellee's discharge from service in the army,
was returned to him, with accumulated interest; and they
further deny the allegations of the bill in respect to the four
hundred dollars ($400), mentioned therein, and allege that
the sum of five hundred dollars ($500) now on deposit in

the Savings Bank of Baltimore City in the name of Morris Galler belongs to him, and not to the appellee.

It will be seen that the disputed question in this case is the *amount* of money that was left by the son, Benjamin Galler, with his father, Morris Galler, upon the terms and conditions hereinbefore stated. The appellee claims that he left with his father four thousand, two hundred dollars ($4,200). The father insists that he left with him but three thousand and three hundred dollars ($3,300).

The appellee testified that he received notice on July 15th, 1918, to report for service on July 25th. Upon the receipt of this notice he sold to his partner his interest in the business, the same to become effective on July 24th, at and for the sum of five thousand and three hundred dollars ($5,300). Mr. Blaustein did not have enough money in cash to pay him this entire amount, so gave to him his check for four thousand dollars ($4,000) and turned over to him merchandise to the amount of one thousand and three hundred dollars ($1,300). The time at which the appellee was to report for service was extended from July 25th to August 1st, and within that time he states that he sold goods upon which he received a profit of two hundred dollars ($200), and for which Mr. Blaustein gave him a check for that sum dated August 27th, 1918. It was the check of Aaron Stein to Blaustein, in part payment of the goods sold, dated ahead for the convenience of Stein. These two checks aggregated four thousand and two hundred dollars ($4,200), and it is the proceeds from the check of four thousand dollars ($4,-000) and the delivery to the father of the two hundred dollar ($200) check that the appellee claims he left with his father.

The appellee testified that the check of four thousand dollars ($4,000) was given him in the store of Blaustein; that his father was present; that he went over to the bank, which was about a block away, cashed the check, and met his father, who was waiting for him across the street, and with him returned to his father's home; that he told his father that he

was going to leave with him this money upon the terms and conditions that he left with him the merchandise, and so gave him four thousand dollars ($4,000) in money.

He further stated that at the time he gave it to him his father told him that he was going to buy a property and he would need four hundred dollars ($400) in making settlement for it; that Blaustein owed him four hundred dollars ($400) that he had left with him for safekeeping, but Blaustein did not have the money at the time with which to pay him, owing to the fact that his cash was exhausted in the purchase of the appellee's interest in the store, and that Blaustein was to give him a note therefor, payable in three months.

It was then agreed between the appellee and his father, as witness stated, that his father should take, of the four thousand dollars ($4,000), four hundred dollars ($400), to enable him to settle for the property he had bought, and that when he received the four hundred dollars ($400) from Blaustein, he was to replace the four hundred taken from the fund turned over to him.

He further testified that on the morning of August 1st, the day upon which he was to report for service he, with his father and mother, went to the Savings Bank of Baltimore, and his father there made a deposit, the amount of which he did not know; that they were there but a little while, when he hurried away so as to reach Union Station at 10 o'clock to take the train leaving at that hour for Camp Meade.

He stated that upon his discharge from service on the 12th of December he first went to a hospital in Baltimore, where he was for a week or ten days, and then to his father's home. That after being there several days he asked his father for the money that he had left with him, and after having been put off several times, covering a period of about ten days, he went with his father and mother to the bank. He said his father there said: "I am going to give you three thousand dollars ($3,000)." When he reminded him that he was to give him all that he had left with him his father

said, "You are going to have a little less," and further said, "If you are going to make a fuss with me, I would not give you anything; if you want three thousand dollars ($3,000), all right." They argued, he said, "fifteen or twenty minutes," and then his father told him he would not give him "a cent more than three thousand, three hundred dollars ($3,300). I could not help myself, I wanted to go in the same business and I told him, All right; was satisfied to get three thousand, three hundred dollars ($3,300) and he to pay me interest." On the same day he consulted an attorney with the view of obtaining the amount ($500) in bank to the credit of his father.

On cross-examination he was asked when it was that his father told him he wished to use four hundred dollars ($400) of the money in settlement for the house that his father had bought. His reply was, "When I was home, when I handed him over the money. Q. He told you that after you got home with the cash, did he? A. Yes. Q. When you cashed this check, that was before you got home? A. Yes. Q. At that time, you did not know anything about using any part of this money for a house, did you? A. Yes; he told me he was going to settle (for the) house in the middle of August. (The Court): When did your father first tell you that? A. He told me that in the morning." He was then asked by the opposing counsel: "Didn't you say just before that, the first thing you knew anything about a part of this money going for the house was when you got home? A. Well, I knew he was going to settle for the property 2010 E. Pratt Street, only in the evening he told me he was going to borrow four hundred dollars ($400) from me to settle it. He told me in the morning and he told me in the evening that he would not deposit all the four thousand dollars ($4,000)." He went to the bank with his father, for, as he says, he thought he might be needed there, but at that time his father had the money and he does not know how much of it he deposited, and did not know until he returned from the service of the Government. He also stated that he gave to him the two

hundred dollar ($200) check referred to, when he gave him the four thousand dollars ($4,000) in money.

The witness was then asked, "And you knew all the time he was going to use four hundred dollars ($400) in that purchase (the purchase of the house)? A. Yes." He was then handed the bill of complaint first filed in the proceeding, and asked if he had not made affidavit to that bill, and he replied, Yes, and stated that he knew the contents of it, when he made oath thereto. He was then asked, "In this paper, second paragraph, you say that 'unknown to your orator, and while he was in the military service of the U. S. Government, his said father, Morris Galler, contrary to the agreement and in violation of his trusteeship, used four hundred dollars ($400) of the said sum towards purchasing the house situate in Baltimore City and known as 2010 E. Pratt Street, wherein the defendant now resides? Now, in that bill of complaint you swore to a fact you did not know and that your father used that money without your knowledge? A. No, sir; he told me he was going to use four hundred dollars ($400)."

Reba Galler, the wife of the appellee, to whom he was married in August, 1919, testified that she was at the home of his parents in July, 1918, on the evening that the appellee brought to his father's house the four thousand dollars ($4,000), representing a part of the purchase money for the interest in his business; that when he came in I said to him: "Well, everything straightened up? 'Yes, I have got my money and all,' and he sat down and counted his money out to his father. His mother was there, his sister, his father and myself. He counted the money out to them. He said, 'Take care of it, deposit it tomorrow morning; I am nervous, I cannot hold this money; I cannot trust myself with it'; and he gave him, his father, the two hundred dollar ($200) check (the check above referred to); he handed everything over to his father and his mother. 'Now take care of this money.' He counted the money in thousands—he had them in his lap; he counted them, and then he said, 'Here is the

four thousand dollars ($4,000), one, two, three, four.' They were all in thousands and he gave it to them. (The Court): Four one thousand notes? A. No, sir; five hundred, one hundred, fifty, twenty, etc., and he just fixed them up in thousands, and he said, 'Here is four thousand; I just had it cashed at the bank.' In regard to the two hundred dollar ($200) check, he said, 'Keep this check, and you do not have to wait until the 27th, until it is due; a few days ahead you can deposit and we will take care of it. Q. Was there any conversation between the Gallers as to using the four hundred dollars ($400) to be applied to the purchase of a house? A. One evening when I was over to the store, Mr. Galler— that is, the father—he said, 'Bennie, what am I going to do about settling my house?' (The Court): What evening was that? A. That was a few evenings before he left. Mr. Blaustein had gone out to get a cigar or something. He did not say it before him; he said it when he was out of the store; he said, 'What am I going to do about my money to settle the house? * * * If Blaustein pays you out the money, what am I going to do?' He said, 'We will see about that later.' He said, 'Will you give me money to settle the house?' He said, 'Well, if you need it, you will get it.' That is all that was said, and Blaustein came in."

She further testified that she was present when the house was settled for, and at the time she wondered how he got the money to settle; so, after they had concluded their settlement, she asked Mr. Galler, 'Did Mr. Blaustein pay you?' He said, 'No; Blaustein's note is not due, but,' he says, 'my son gave me money to settle the house, and as soon as Blaustein's note is due I will deposit it. There will be no trouble,' he said. I said, 'No, not if you deposit it.' " The settlement was made for the house about a week after the appellee went to Camp Meade.

Morris Galler testified that his son came to his home after 6 o'clock on the evening of the day preceding the day that he left for Camp Meade. His mother and sister and an old

gentleman who sometimes visited the house, by the name of Kimmel, were present. On that evening he spoke of the money that he had received for his business. He did not give any of it to him, but merely showed the money and said he had it; and it was arranged at the son's suggestion that his father and mother should meet him at the bank the next morning to deposit the money. "We got to the bank, and he did not come until half an hour later. When he arrived he and my wife went up to the window to the man. Then he, my son, said to the man, 'I have three thousand, three hundred dollars ($3,300) that I want to deposit in all three names. The man at the window said he could not do that; he could not put it in three names, but could put it in two. I then suggested that the money should be put in in his mother's name. He said, 'Well, no; let it be in your name'; that is, in my name and mother's name. I said, 'All right,' but I never counted out the money. He himself counted out the money, but I had to sign my name because it was in my name, and then we all left. He went somewhere else and we went home. That was in the morning, and he left for Camp Meade. * * * When he told me that he was winding up his partnership, I said, 'What about it; what about the money that you owe me, the money the partnership owes me?'" The money referred to was the money heretofore mentioned as that owing to him by Blaustein. "'Well,' he said, 'now these are all the resources that the firm has, three thousand, three hundred dollars ($3,300). Now, if you will insist upon our paying you now the four hundred dollars ($400), all I would collect would be two thousand and nine hundred dollars ($2,900). Now,' he says, 'you are home, you are here in Baltimore; I am not, and you can collect the money very readily when I am away, your money.' I felt like a father to him, and I decided I would yield to him, so I accepted a note for four hundred dollars ($400), this note for four hundred dollars ($400). He deposited three thousand, three hundred dollars ($3,300), because I was stand-

ing right there at the window and saw him count it." After the deposit was made the bank book was given to him.

He was then asked, "It has been testified here by the bank that on August 1st there was a deposit made of three thousand, three hundred dollars ($3,300). On August 17th there was a deposit of two hundred dollars ($200)? A. Yes." When asked concerning the two hundred dollar ($200) check he said that the check of two hundred dollars ($200) was given to him by his son while at Camp Meade. At that time his son was owing to him the sum of one hundred and forty dollars ($140), and, on one of his visits to him, he asked him to pay it, and his son said, "I will give you the check for two hundred dollars ($200) and you will give me sixty dollars ($60), and I gave him three twenty-dollar bills," and the son gave to him the check and he deposited it in bank. There was a further deposit of three hundred dollars ($300) as of August 5th. This, he said, was a part of the Blaustein note that was about that time paid to him. He did not deposit all of it; a part he kept for "running expenses." He denied that he used one cent of money given to him by his son to pay on the purchase money for the house.

He further testified that on Thursday, a little over one week after he had returned to his home, after his discharge from the army, he asked him for his money. "He called me up on the 'phone. He said, 'Come up to the bank.' I said, 'Let it go until tomorrow' * * *. Early in the morning I got up. He was still asleep, and I woke him up, saying, 'Bennie, today is Friday, tomorrow is Saturday; I will stop work tomorrow and we will go down to the bank and get the money.' And he said, 'All right.' On Saturday we arranged to meet at the bank at 10 o'clock. When I got there at 10 o'clock he was there. Then we went up to the man at the window; then I signed on a piece of paper. I said, 'Hand out three thousand, three hundred dollars ($3,300)'; that this money belonged to him and for him to place it in his own name. Well, then, he began to quarrel, and said, 'You let me have your five hundred dollars ($500), too.' He said,

'At this place they are only paying three per cent., and I will pay you six per cent.' I said, 'I did not want to have any business with this.' Then he said he needed the money because he had to put four thousand dollars ($4,000) in the bank. I said, 'Here is three thousand, three hundred dollars ($3,300) cash,' and I said to him, 'You have about a thousand dollars' worth of goods at the house. You have more than you need. You have the money.' Well, then, he wanted five hundred dollars ($500) and said that he would pay me six per cent., and I said I did not want to give it to him, * * * The man figured that the interest would be $42.50, and the money was handed over, and then he deposited three thousand dollars ($3,000) in the bank and $342.50 he placed in his pocket. Then he got his book, and then I got a separate book on my five hundred dollars ($500.00). As we came out he took out five dollars ($5.00) and handed it to me and said, 'This is your part of the interest on the money.' " This money the appellee said his father borrowed from him upon the promise to pay it back on Saturday. It was afterwards shown that the day upon which it was handed by the son to the father was Saturday, in the morning, and the father was paid each week at 12 o'clock on Saturday.

Eva Galler, the mother of the appellee, testified that he came home on the evening of the 31st of July about 6 o'clock. "My husband, myself and my girl were there, and he said to us that he had severed partnership with Blaustein and that he had received three thousand, three hundred dollars. ($3,300). He said that he wanted to put it in my and his. father's name, and I began to cry. We did not see the money then. Then he told us to be up to the bank the next morning at 9 o'clock and that the money would then be transferred. Well, when we got to the bank he was not there, and then later he came. He went up to the man and—well, I really didn't see, but he put in the money and put it in our names, in both our names." She said, "He counted it out in front of the man, three thousand and three hundred dollars ($3,300)"; that her son "had the money in his hands all the

time; didn't let it out of his hands," and that he received the
bank book and gave it to his father. Witness denied that the
young woman who afterwards became the wife of the appel-
lee was at her home on the evening of the 31st day of July,
for at such time, she said, she was on bad terms with wit-
ness. The mother, who was present at the bank when the
money was withdrawn, corroborates the father in what was
said and done there at that time.

Ida Galler, the sister of the appellee, testified that when
her brother came in the house on the evening of July 31st,
she, her father and mother were at home. He came in and
said: "Pa, my, I got three thousand and three hundred dol-
lars ($3,300), and I want you to come down tomorrow 9
o'clock to Baltimore and Charles Streets (the location of the
Savings Bank of Baltimore), and I am going to leave the
money for you and, you know, for my mother." When asked
did he count out any money then, she said, "No; he didn't
show nobody. He just said that and he went away. He said
he had it, but didn't show it. He told my father that and
went out again."

Solomon Kimmel, "the old gentleman" to whom Morris
Galler referred in his testimony, testified that on one occa-
sion he was at Morris Galler's home when his son, the ap-
pellee, came in and said, among other things, "I have made
my mother rich—look at her—I made her a rich woman. I
handed her three thousand and there hundred dollars ($3,-
300)." This was after he had returned from camp. He did
not recall, however, being at Morris Galler's house on the
evening before the appellee left for camp.

It will be seen that the evidence, upon the question as to
the amount of money that was left by the appellee with his
father for safekeeping until his return home, is very conflict-
ing. The appellee's claim is that his father has failed to
return to him nine hundred dollars ($900) of the amount
that he left with him—that is to say, that he left with him
four thousand and two hundred dollars ($4,200), and that

his father has returned to him only three thousand and three hundred dollars ($3,300).

His claim against his father for the sum of nine hundred dollars ($900) depends, of course, upon the fact that he left with him four thousand and two hundred dollars ($4,200), and the burden is upon him to first show that he left with him that sum of money before any burden can be said to rest upon his father to account for such sum.

The evidence, which we have very fully stated, fails to establish the fact that the son left with the father so much as four thousand and two hundred dollars ($4,200.00).

With the exception of the bank official, who could not recall anything that was said or done at the time the money was deposited, the only ones present at that time were the appellee, his father and mother. Both the father and mother testified that the money was not paid over by the son to the father; that the son had it when in bank; that it was he who counted it out and gave it to the bank official, and that the bank book was given to him and by him given to the father.

The son, who it seems had been longer in this country than his parents and was more familiar with the English language, and more capable of attending to business, admits that he was at the bank, and that he suggested to his mother and father that they be at the bank with him when this money was deposited; that he went there thinking that he might be needed, and yet, from his testimony, he was indifferent as to what was done at the bank at such time and did not know the amount of money deposited, nor did he attempt to ascertain the amount of same, although he was there to render what aid he could and to see that the matter was correctly attended to. He never looked to see the amount entered upon the book which his father and mother say was handed to him after the deposit was made, but left the bank totally ignorant of the amount deposited. The father and mother both say that three thousand and three hundred dollars ($3,300) were deposited at the bank, and that the con-

versation in relation thereto was between the bank official and the son.

The father, mother and sister all testified to the conversation on July 31st, the evening before the day upon which the deposit was made, and they all say that the amount there mentioned by the appellee was three thousand and three hundred dollars ($3,300) ; that no money at the time was paid over, and that the father and mother were to meet him the next day at the bank.

It is true this testimony is denied by both the appellee and the young woman who thereafter became his wife. The son stated that the check, dated July 30th, 1918, for four thousand dollars ($4,000), given to him by his partner in part payment of the purchase price for his interest in the business, was given to him at the store; that he went to the bank, which was a short distance from the store, alone, cashed it, and joined his father on the street when he came out of the bank; that they walked home together, and he gave him the four thousand dollars ($4,000), and that two hundred dollars ($200) was subsequently given him. The fact that he gave him so much as four thousand dollars ($4,000) on that occasion is corroborated by the woman now his wife.

In his testimony, however, he states that he agreed that his father should take from that amount temporarily the sum of four hundred dollars ($400), to be used by him in paying for a house that he had previously bought, and yet from a fair interpretation of his testimony he cashed the check before it was known or agreed to that four hundred dollars ($400) of it was to be used by the father. If at the time he received the check it was his purpose to leave the whole amount of it with his father to be deposited in bank and to take none therefrom for other purposes, it may well be asked, why did he cash the check?

By the great preponderance of testimony, the money obtained on the check was held for two days before it was deposited, subject to any disposition that he might make of it. It

may also be said that, assuming that his father was to have the use of four hundred dollars ($400) of the four thousand dollars ($4,000), it would seem that he, at least, would be interested in knowing that three thousand and six hundred dollars ($3,600) of it was deposited; and yet, although he accompanied them to the bank for the purpose, as we have said, of seeing that the matter was properly attended to and the rights of his father and mother, as well as his own, incidentally were protected, he did not, as he says, look at the bank book to see that such amount was deposited therein.

The appellee has, we think, utterly failed to establish the fact that so much as four thousand and two hundred dollars ($4,200) were left with his father; hence the decree of the Court below, decreeing that the Savings Bank of Baltimore City should pay over to Benjamin Galler the sum of five hundred dollars ($500), with interest, on deposit in the bank in the name of Morris and Eva Galler, and decreeing that the said Morris and Eva Galler should pay unto Benjamin Galler the sum of four hundred dollars ($400), with interest from the time therein stated, will be reversed.

In view of what we have said, it becomes unnecessary to consider or pass upon the jurisdictional question raised.

*Decree reversed and bill dismissed, with costs to the appellants.*